# EXHIBIT 1

CROSNER LEGAL, P.C.
Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

*Attorneys for Plaintiff and the Proposed Class*

**Electronically FILED by
Superior Court of California,
County of Los Angeles
1/23/2026 1:59 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By S. Cwikla, Deputy Clerk**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

## UNLIMITED JURISDICTION

| | |
|---|---|
| CHRIS RODRIGUEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COVE DRINKS, INC., a Delaware corporation,<br><br>Defendant. | Case No. 26STCV02385<br><br>**CLASS ACTION COMPLAINT FOR**:<br><br>1. Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*;<br>2. Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§17200, *et seq.*; and<br>3. Breach of Express Warranty<br><br><u>DEMAND FOR JURY TRIAL</u> |

CROSNER LEGAL, P.C.

## INTRODUCTION

1.       Plaintiff Chris Rodriguez, ("Plaintiff") individually and on behalf of all others similarly situated, and the general public, by and through undersigned counsel, hereby brings this action against Cove Drinks, Inc. ("Defendant" or "Cove"), and upon information and belief and investigation of counsel, alleges as follows:

2.       This is a California consumer class action for violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ("CLRA"), Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL"), and for breach of express warranty.

3.       Defendant manufactures, distributes, advertises, markets, and sells Cove Probiotic Soda products where the label prominently displays that these Products contain "**No Artificial Sweeteners.**"[1]

4.       This statement is false. Each of the Products are made with stevia extract and/or erythritol—artificial sweetener ingredients used in food  and beverage products.

5.       Defendant's packaging, labeling, and advertising scheme is intended to give consumers the impression that they are buying a premium product that is free from artificial sweeteners.

6.       Plaintiff, who purchased the Products in California, was deceived by Defendant's unlawful conduct and brings this action individually and on behalf of California consumers to remedy Defendant's unlawful acts.

## JURISDICTION AND VENUE

7.       This Court has jurisdiction pursuant to Article VI, Section 10 of the California Constitution and California Code of Civil Procedure § 410.10.

8.       This Court has personal jurisdiction over Defendant because Defendant conducts and transacts business in the State of California, contracts to supply goods within the State of California, and supplies goods within the State of California. Defendant, on its own and through its agents, is responsible for the distribution, marketing, labeling, and sale of the Products in

---

[1] The "Products" include all Cove Probiotic Soda products labeled with a "No Artificial Sweeteners" claim that contain stevia extract and/or erythritol as an ingredient.

CLASS ACTION COMPLAINT

California, specifically in this county. The marketing of the Products, including the decision of what to include and not include on the labels, emanates from Defendant. Thus, Defendant has intentionally availed itself of the markets within California through its advertising, marketing, and sale of the Products to consumers in California, including Plaintiff.

9.      The Court also has specific jurisdiction over Defendant as it has purposefully directed activities towards the forum state, Plaintiff's claims arise out of those activities, and it is reasonable for Defendant to defend this lawsuit because it has sold deceptively advertised Products to Plaintiff and members of the Class in California. By distributing and selling the Products in California, Defendant has intentionally and expressly aimed conduct at California which caused harm to Plaintiff and the Class that Defendant knows is likely to be suffered by Californians.

10.      Venue is proper in this county pursuant to Cal. Civ. Code. § 1780(c) because Defendant is doing business in this county as the Products are offered for sale in this county.

**PARTIES**

11.      Defendant is a Delaware corporation that maintains its principal place of business in Halifax, Nova Scotia, Canada. At all times during the class period, Defendant was the manufacturer, distributor, marketer, and seller of the Products.

12.      Plaintiff is a resident of California. Plaintiff purchased the Products during the class period in California. Plaintiff relied on Defendant's deceptive advertising and labeling claims as set forth below.

**FACTUAL ALLEGATIONS**

**"NO ARTIFICIAL SWEETENERS" IS PROMINENTLY DISPLAYED ON THE LABELS OF THE PRODUCTS**

13.      The labels for each of the Products prominently state that the Products contain "No Artificial Sweeteners" thereby misleading reasonable consumers into believing that the Products are free from artificial sweeteners. However, each of the Products contains the artificial sweetener ingredients stevia extract and erythritol. Below is an example of a label for one of the Products:

CROSNER LEGAL, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROSNER LEGAL, P.C.





3

CROSNER LEGAL, P.C.

14.     Each of the Products contain either stevia extract or erythritol For example, below is the ingredient list for the Ice Pop Cove Soda product pictured above:



**THE STEVIA EXTRACT IN THE PRODUCTS IS AN ARTIFICIAL SWEETENER**

15.     The Joint FAO/WHO Expert Committee on Food Additives ("JECFA") has repeatedly made clear that the commercial ingredient sold as stevia extract is not the same as the crude leaf. At its 63rd meeting, JECFA stated: "The most appropriate name to be used for this extract was 'steviol glycosides', to reflect that the extract contained a mixture of steviol glycosides."[2]

16.     JECFA established that the purified additive must meet strict purity thresholds: "The 63rd JECFA required that the summed content of stevioside and rebaudioside A was not less than 70% and established a minimum purity of 95% total steviol glycosides."[3] Later assessments reiterated: "The products in commerce contain at least 95% of total steviol glycosides (on the dried basis) with a variable composition depending upon the composition within."[4]

---

[2] *Draft Assessment Report- Steviol Glycosides As Intense Sweeteners*, FOOD STANDARDS AUSTRIALIA AND NEW ZEALAND (May 23, 2007), *available at* https://www.foodstandards.gov.au/sites/default/files/food-standards-code/applications/Documents/A540_Stevioside_DAR_FINAL.doc

[3] *84th JECFA - Chemical and Technical Assessment-Steviol Glycosides,* FOOD AND AGRICULTURE ORGANIZATION OF THE UNITED NATIONS (2017), available at https://openknowledge.fao.org/server/api/core/bitstreams/38aa454a-e164-4f3e-95c0-bb4938d8aa90/content?utm_source=chatgpt.com

[4] *Id.*

17.     In short, JECFA defines stevia sweeteners as high-purity chemical isolates, not the natural leaf. According to JECFA's Chemical and Technical Assessment: "Steviol glycosides preparations are white or slightly yellowish white crystalline … water soluble powders, which are 200 to 300 times sweeter than sucrose."[5]

18.     These crystalline powders are not naturally present in the plant. They result from a multi-step industrial process. The manufacturing process begins with dried stevia leaves, which are crushed or ground to increase extraction yield. The leaves are then steeped in hot water to draw out the glycosides.

19.     The resulting aqueous extract contains not only steviol glycosides but also pigments, proteins, tannins, and other plant material. To remove these, the liquid undergoes clarification using either chemical coagulation or electro-coagulation, followed by filtration through industrial filter presses.

20.     The clarified solution is then subjected to ion-exchange chromatography, passing sequentially through cation and anion exchange resins. These steps strip out minerals, proteins, and colored compounds, leaving only the glycosides.

21.     Next, the extract is passed through adsorption columns packed with macro-porous resins. The steviol glycosides bind to the resin surface. To recover them, manufacturers flush the resin with organic solvents such as ethanol, which desorb the glycosides into solution.

22.     The alcoholic glycoside solution is then concentrated using nanofiltration membranes to reduce water content and remove smaller molecules. Further purification steps are applied, often including activated carbon treatment to decolorize the extract, followed by additional ion-exchange to remove trace impurities.

23.     Finally, the concentrated syrup is spray-dried in industrial equipment, producing a crystalline white powder composed of rebaudioside A, stevioside, and related glycosides. The result bears no resemblance to the natural leaf. What begins as green plant matter ends as an industrially manufactured powder hundreds of times sweeter than sugar.

---

[5] *Id.*

CROSNER LEGAL, P.C.

24.    These steps chemically and structurally transform the plant material into a product that does not exist in the natural leaf. It is also a visibly artificial process, as shown in the screenshots below taken from a video tutorial on the stevia extraction process[6]:



CROSNER LEGAL, P.C.





CROSNER LEGAL, P.C.

25.    This distinction—between crude leaf and purified additive—is critical. Crude stevia leaves are not approved for use in food in the United States; only the highly purified, chemically processed steviol glycosides are considered safe for use as sweeteners.

26.    Congress defines "synthetic" as "a substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring … sources." 7 U.S.C. § 6502(21).

27.    Highly purified, crystalline steviol glycosides are not "naturally occurring" constituents of yogurt. They are industrially manufactured additives.

28.    Stevia Leaf Extract is used in the Products not for any nutritional purpose, but solely to provide sweetness in place of sugar. Because of the extreme sweetness of Steviol glycosides, only very small amounts are needed to deliver the taste profile of sugar while contributing virtually no calories.

29.    Manufacturers adopt stevia for two main reasons: (1) sugar replacement—to market products as "zero sugar" or "reduced sugar" while maintaining palatability, and (2) calorie reduction—to appeal to health-conscious consumers and those managing conditions such as diabetes.

30.    Stevia's use is therefore indistinguishable from other artificial sweeteners like aspartame or sucralose: it is a non-nutritive, high-intensity sweetening agent added to processed foods to replace sugar. Consumers reasonably understand such substances to be artificial sweeteners, regardless of their botanical origin.

**THE ERYTHRITOL IN THE PRODUCTS IS AN ARTIFICIAL SWEETENER**

31.    In addition to stevia leaf extract, the Products also contain erythritol, a chemically manufactured sweetener ingredient. Erythritol is not natural and is properly classified as an artificial sweetener because it is man-made through industrial fermentation processes that fundamentally alter raw agricultural materials.

32.    Erythritol is a sugar alcohol (polyol) that rarely occurs in meaningful concentrations in nature. While trace amounts can be found in certain fruits (such as pears and melons) and fermented foods like soy sauce, the commercially used erythritol in foods and

8

beverages is not extracted from these natural sources. Instead, it is artificially manufactured in industrial facilities because naturally occurring concentrations are too low for practical extraction.

33.     Erythritol is produced by fermentation of glucose or sucrose using genetically modified microorganisms such as *Moniliella pollinis* or *Trichosporonoides.megachiliensis*. The process begins by extracting starch—typically from corn or wheat—and hydrolyzing it into glucose using acid or enzymatic hydrolysis. This glucose-rich substrate is then fermented by engineered yeast strains under tightly controlled pH, oxygen, and temperature conditions to convert sugars into erythritol.

34.     After fermentation, the broth is filtered, purified, and crystallized using ion-exchange chromatography, activated carbon, and multiple chemical purification steps, yielding crystalline erythritol. These stages remove other fermentation byproducts and residual organic compounds, producing a highly refined white powder that is then dried and milled before packaging.

35.     Thus, although erythritol molecules may be chemically identical to those that could be found in small quantities in nature, the final ingredient in the Products is a synthetic, industrially manufactured substance that bears no resemblance to anything found naturally. It is a man-made sweetener.

36.     Below is a flow chart showing the manufacturing process for Erythritol.

CROSNER LEGAL, P.C.

CROSNER LEGAL, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

```
                    ┌──────────────┐
                    │  Starch milk │
                    └──────┬───────┘
                           ▼
                    ┌──────────────┐
                    │   Adjusting  │
                    └──────┬───────┘
                           ▼
                    ┌──────────────┐        ┌────────────────┐
                    │ 1st jet cooking│◄──────│  NaOH / enzyme │
                    │   / flashing  │        └────────────────┘
                    └──────┬───────┘
                           ▼
                    ┌──────────────┐
                    │  Liquefaction│
                    └──────┬───────┘
                           ▼
                    ┌──────────────┐
                    │ 2nd jet cooking│
                    │   / flashing  │
                    └──────┬───────┘
    ┌─────────────┐        ▼
    │ HCl / enzyme│──────►┌──────────────┐
    └─────────────┘       │Saccharification│
                          └──────┬───────┘
                                 ▼
    ┌─────────────┐       ┌──────────────┐       ┌────────────────┐
    │Active carbon│       │Protein filtration│──►│ Protein residue│
    └──────┬──────┘       └──────┬───────┘       └────────────────┘
           │                     ▼
           └──────────────►┌──────────────┐
                           │   Refinery   │
                           └──────┬───────┘
    ┌─────────────┐               ▼
    │  Seed and   │──────►┌──────────────┐
    │ sterilization│      │ Fermentation │
    └─────────────┘       └──────┬───────┘
                                 ▼
                          ┌──────────────┐
                          │  Evaporation │
                          └──────┬───────┘
                                 ▼
                          ┌──────────────┐
                          │Crystallization│
                          └──────┬───────┘
                                 ▼
                          ┌──────────────┐
                          │   Centrifuge │
                          └──────┬───────┘
                                 ▼
                          ┌──────────────┐       ┌────────────────┐
                          │    Drying    │──────►│   Erythritol   │
                          └──────────────┘       └────────────────┘
```

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S "NO ARTIFICIAL
SWEETENERS" CLAIM**

37.     Consumers, like Plaintiff, relied on Defendant's "No Artificial Sweeteners"
labeling statement.

38.     The "No Artificial Sweeteners" statement on the labels of the Products is material
to reasonable consumers: "foods bearing 'free-from' claims are increasingly relevant to
Americans, as they perceive the products as closely tied to health … 84 percent of American
consumers buy free-from foods because they are seeking out more natural or less processed
foods. In fact, 43 percent of consumers agree that free-from foods are healthier than foods
without a free-from claim, while another three in five believe the fewer ingredients a product
has, the healthier it is (59 percent)."[7]

39.     Empirical research confirms that consumers are wary of artificial sweeteners and
often consider them harmful. A 2025 peer-reviewed study of 649 participants found that 64.1%
of consumers believed artificial sweeteners are harmful, while only 6.9% considered them not
harmful.[8] Among parents of preschool and school-aged children, the perception was even
stronger: 74.1% considered artificial sweeteners harmful. These findings are consistent with
other international surveys showing that a majority of consumers associate artificial sweeteners
with negative health effects.[9]

40.     The same study documented that consumers' engagement with food labels is low,
meaning that when companies prominently advertise "No Artificial Sweeteners" claims, those
assurances carry heightened significance. Only 16% of parents and 8% of students reported that

---

[7] *84% of Americans buy "free-from" foods because they believe them to be more natural or less
processed*, Mintel (Sept. 3, 2015), *available at* https://www.mintel.com/press-centre/84-of-
americans-buy-free-from-foods-because-they-believe-them-to-be-more-natural-or-less-
processed/

[8] B. Jurcevic Zidar et al., *Consumer Perceptions of Artificial Sweeteners in Food Products,
Consumption Frequency, and Body Mass Index: A Multivariate Analysis*, NUTRIENTS (Feb. 27,
2025), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC11902076/

[9] *Id.*

they "always" read labels. For consumers like Plaintiff, this makes front-of-pack labeling especially material.[10]

41.    This consumer research underscores that "No Artificial Sweetener" claims directly impact purchasing decisions: consumers pay premiums for such "clean label" products and choose them specifically to avoid perceived risks. The marketplace recognizes this preference, as manufacturers charge more for "free-from" products and capture substantial market share in the rapidly growing clean label ingredients sector.

42.    Indeed, studies show a growing number, if not a majority of, consumers choose foods made with clean ingredients.[11] In 2024, the global clean label ingredients market size was $44 billion.[12] As such, tapping into the clean label market is important to a company's growth and bottom line.[13] Indeed, it is well documented that manufacturers charge and consumers are willing to a pay a premium for products with clean ingredients (e.g., those that lack artificial sweeteners).[14]

---

[10] *Id.*

[11] *IFIC Survey: From "Chemical-sounding" to "Clean": Consumer Perspectives on Food Ingredients*, FOOD INSIGHT (June 17, 2021), *available at* https://foodinsight.org/ific-survey-from-chemical-sounding-to-clean-consumer-perspectives-on-food-ingredients/; Alverson, Chloe, *Consumer trends continue to prioritize clean label, non-GMO beverage*s, BEVERAGE INDUSTRY, *available at* https://www.bevindustry.com/articles/96687-consumer-trends-continue-to-prioritize-clean-label-non-gmo-beverages.

[12]*Clean Label Ingredient - Market Share Analysis, Industry Trends & Statistics, Growth Forecasts (2024 - 2029)* (synopsis), MORDOR INTELLIGENCE, *available at* https://www.researchandmarkets.com/reports/4771850/clean-label-ingredient-market-share-analysis?w=5; *Clean Label Ingredients Market is Projected to Reach US$ 125.5 Billion and a Dynamic CAGR of 4.2% by 2030*, PERSISTENCE MARKET RESEARCH (Jan. 18, 2024), *available at* https://www.globenewswire.com/en/news-release/2024/01/18/2811262/0/en/Clean-Label-Ingredients-.

[13] *Uncovering the clean label connection to business grow* (May 16, 2022), *available at* https://www.ingredion.com/na/en-us/be-whats-next/growth-with-clean-label.html; *Uncovering the clean label connection to business growth*, INGREDION (May 16, 2022), *available at* https://www.ingredion.com/na/en-us/be-whats-next/growth-with-clean-label.html.

[14] *The Truth About Clean Label — and Why It Matters*, PERDUE FOOD SERVICE (Oct. 18, 2021), *available at* https://www.perduefoodservice.com/resources/trends-insights/the-truth-about-clean-label-and-why-it-matters/; Jacobsen, Jessica, *Consumer awareness of clean label drives demand for ingredient solutions*, BEVERAGE INDUSTRY, *available at*

CROSNER LEGAL, P.C.

43.    Plaintiff and the putative class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent.

44.    Plaintiff and putative class members are entitled to damages and restitution for the purchase price of the Products that were falsely labeled and advertised. Consumers, including Plaintiff, would not have purchased Defendant's Products, or would have paid less for the Products, if they had known the Products actually contain an artificial sweetener ingredient.

### PLAINTIFF'S PURCHASE OF THE PRODUCTS

45.    Plaintiff purchased one or more of the Products with a "No Artificial Sweeteners" label claim during the class period from a retail store located in Los Angeles County, California.

46.    When purchasing the Product, Plaintiff did not expect that the "No Artificial Sweeteners" statement on the front label was false. Plaintiff did not expect Defendant to publicly place deceptive statements about the contents of its Products on the front label of its Products.

47.    Plaintiff saw and relied on the "No Artificial Sweeteners" claim on the label of the Product when he purchased it.  Plaintiff would not have purchased the Product, or would have paid less for the Product, had he known that the Product actually contains an artificial sweetener ingredient.

48.    As a result, Plaintiff suffered injury in fact when he spent money to purchase the Product he would not have purchased, or would have paid less for, absent Defendant's misconduct.

49.    Plaintiff wants to purchase the Products again if the label of the Products was accurate and if the Products truthfully contained "No Artificial Sweeteners." However, as a result of Defendant's ongoing misrepresentations, Plaintiff is unable to rely on the Products' labeling when deciding in the future whether to purchase the Products.

https://www.bevindustry.com/articles/95110-consumer-awareness-of-clean-label-drives-demand-for-ingredient-solutions.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

## NO ADEQUATE REMEDY AT LAW

50.     Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

51.     The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the product labels, packaging, and online advertisements, over a long period of time, in order to gain an unfair advantage over competitor products.

52.     Plaintiff and class members may also be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (e.g., the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct).

53.     Further, equitable remedies are tried by the Court which is quicker, less expensive and more efficient so there is no adequate remedy at law for the restitution and injunctive relief claims at issue since those are to be tried by the Court and not a jury.

54.     A primary litigation objective in this litigation is to obtain injunctive relief. Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to misrepresent the Products as containing "No Artificial Sweeteners" when the Products actually contain the artificial sweetener ingredients stevia leaf extract and erythritol.

55.     Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm— none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, because a public injunction is available under the UCL, and damages will not adequately benefit the general public in a manner equivalent to an injunction.

CROSNER LEGAL, P.C.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

## CLASS ACTION ALLEGATIONS

56.    Plaintiff brings this action as a class action pursuant to Cal. Code. Civ. Proc. § 382 on behalf of the following Classes (collectively "the Class"):

**California Class**
All persons who purchased the Products for personal use in California within the applicable statute of limitations until the date class notice is disseminated.

**Nationwide Class**
All persons who purchased the Products for personal use in the United States within the applicable statute of limitations until the date class notice is disseminated.

57.    Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; (iv) individuals who received a full refund of the Products from Defendant.

58.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate subclasses, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

59.    The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

60.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

61.    <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.    Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.      Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c.      Whether Defendant made misrepresentations concerning the Products that were likely to deceive the public;

d.      Whether Plaintiff and the Class are entitled to injunctive relief;

e.      Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

62.     Typicality: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

63.     Adequacy: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

64.     The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.      The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

CROSNER LEGAL, P.C.

b.      The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.      When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.      This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

e.      Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.      This class action will assure uniformity of decisions among Class Members;

g.      The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.      Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

65.     Additionally or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

66.     Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and the Class members.

67.     Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

CROSNER LEGAL, P.C.

**FIRST CLAIM FOR RELIEF**

*Violation of California's Consumers Legal Remedies Act*

*Cal. Civ. Code §§ 1750 et seq.*

68.     Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

69.     Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

70.     At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

71.     At all relevant times, Defendant was a "person," as defined in California Civil Code section 1761(c).

72.     At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

73.     The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

74.     Defendant disseminated, or caused to be disseminated, through its advertising, false and misleading representations, including the Products' labeling that the Products contain "No Artificial Sweeteners." Defendant failed to disclose that the Products contain an artificial sweetener ingredient called stevia leaf extract.

75.     This is a material misrepresentation and omission as a reasonable consumer would find the fact that the Products contain an artificial sweetener to be important to their decision in purchasing the Products. Defendant's representations violate the CLRA in the following ways:

a)     Defendant represented that the Products have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)     Defendant represented that the Products are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

CROSNER LEGAL, P.C.

18

c)        Defendant advertised the Products with an intent not to sell the Products

as advertised (Cal. Civ. Code § 1770(a)(9)); and

d)        Defendant represented that the subject of a transaction has been supplied

in accordance with a previous representation when it has not (Cal. Civ. Code §

1770(a)(16)).

76.        Defendant violated the CLRA because the Products were prominently advertised

as containing "No Artificial Sweeteners" but, in reality, the Products contain artificial sweetener

ingredients called stevia extract and erythritol. Defendant knew or should have known that

consumers would want to know that the Products contain an artificial sweetener.

77.        Defendant's actions as described herein were done with conscious disregard of

Plaintiff's and the Class members' rights and were wanton and malicious.

78.        Defendant's wrongful business practices constituted, and constitute, a continuing

course of conduct in violation of the CLRA, since Defendant is still representing that the

Products have characteristics which they do not have.

79.        Pursuant to California Civil Code section 1782(d), Plaintiff and the members of

the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices

alleged herein.

80.        Pursuant to California Civil Code section 1782, Plaintiff will notify Defendant in

writing by certified mail of the alleged violations of the CLRA and will demand that Defendant

rectify the problems associated with the actions detailed above and give notice to all affected

consumers of their intent to so act. If Defendant fails to rectify or agree to rectify the problems

associated with the actions detailed herein and give notice to all affected consumers within 30

days of the date of written notice pursuant to section 1782 of the CLRA, then Plaintiff will

amend the complaint to seek damages.

81.        Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this

action was commenced in a proper forum.

**S<span>ECOND</span> C<span>LAIM FOR</span> R<span>ELIEF</span>**

*Violation of California's Unfair Competition Law*

*Cal. Bus. & Prof. Code §§ 17200 et seq.*

82.     Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

83.     Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

84.     The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

85.     Defendant committed unlawful business acts or practices by making the representations and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as set forth more fully herein, and by violating California's Consumers Legal Remedies Act, Cal. Civ. Code §§17500, *et seq.*, California's False Advertising Law, Cal. Bus. & Prof. § 17500, *et seq.*, 15 U.S.C. § 45, and by breaching express and implied warranties. Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

86.     Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein.

87.     There is no societal benefit from deceptive advertising.

88.     Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products contain an artificial sweetener) of which they had exclusive knowledge.

89.    While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy.

90.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. For example, it does not have to include the false claim on the labeling.

91.    Defendant committed "fraudulent" business acts or practices by making the representations of material fact regarding the Products set forth herein. Defendant's business practices as alleged are "fraudulent" under the UCL because they are likely to deceive customers into believing the Products actually contain no artificial sweeteners.

92.    Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Products and Defendant's unlawful, unfair, and fraudulent practices.

93.    Defendant's wrongful business practices and violations of the UCL are ongoing.

94.    Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

95.    Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate.

96.    Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seeks (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California law; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

CROSNER LEGAL, P.C.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROSNER LEGAL, P.C.

### THIRD CLAIM FOR RELIEF

### *Breach of Express Warranty*

97.     Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

98.     Plaintiff brings this claim for breach of express warranty individually and on behalf of the Class against Defendant.

99.     As the manufacturer, marketer, distributor, and seller of the Products, Defendant issued an express warranty by representing to consumers at the point of purchase that the Products contain "No Artificial Sweeteners."

100.    Plaintiff and the Class reasonably relied on Defendant's misrepresentations, descriptions and specifications regarding the Products, including the representation that the Products contain "No Artificial Sweeteners."

101.    Defendant's representations were part of the description of the goods and the bargain upon which the goods were offered for sale and purchased by Plaintiff and Members of the Class.

102.    In fact, the Products do not conform to Defendant's representations because the Products contain  artificial sweetener ingredients called stevia  extract and erythritol. By falsely representing the Products in this way, Defendant breached express warranties.

103.    Plaintiff relied on Defendant's (the manufacturer) representations on the Products' labels and advertising materials which provide the basis for an express warranty under California law.

104.    As a direct and proximate result of Defendant's breach, Plaintiff and Members of the Class were injured because they: (1) paid money for the  Products that were not what Defendant represented; (2) were deprived of the benefit of the bargain because the  Products they purchased were different than Defendant advertised; and (3) were deprived of the benefit of the bargain because the Products they purchased had less value than if Defendant's representations about the characteristics of the Products were truthful.

CLASS ACTION COMPLAINT

105.    Had Defendant not breached the express warranty by making the false representations alleged herein, Plaintiff and Class Members would not have purchased the Products or would not have paid as much as they did for them.

<u>**REQUEST FOR RELIEF**</u>

Plaintiff, individually, and on behalf of all others similarly situated, request for relief pursuant to each claim set forth in this complaint, as follows:

a.    Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b.    Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.    Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.    Ordering damages in an amount which is different than that calculated for restitution for Plaintiff and the Class;

e.    Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f.    Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.    Ordering such other and further relief as may be just and proper.

<u>**JURY DEMAND**</u>

Plaintiff hereby demands a trial by jury of all claims in this Complaint so triable.

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

Dated: January 23, 2026

CROSNER LEGAL, P.C.

By:  */s/ Michael T. Houchin*

Michael T. Houchin (SBN 305541)
mhouchin@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

*Attorneys for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT

CROSNER LEGAL, P.C.

<u>Civil Code Section 1780(d) Affidavit</u>

I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act. Defendant has done, and is doing, business in California, including in this county. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed January 23, 2026 at San Diego, California.

By:  /s/ *Michael T. Houchin*

CLASS ACTION COMPLAINT